ESTATE OF ELEANOR O. PILLSBURY, DECEASED, SAN DIEGO TRUST & SAVINGS BANK, EXECUTOR AND TRUSTEE, UNDER ELEANOR O. PILLSBURY 1984 TRUST, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Pillsbury v. Commissioner
Docket No. 4302-90
United States Tax Court
T.C. Memo 1992-425; 1992 Tax Ct. Memo LEXIS 442; 64 T.C.M. (CCH) 284; July 27, 1992, Filed *442 Decision will be entered under Rule 155. For Petitioner: Laurence L. Pillsbury and Robert K. Smith. For Respondent: Thomas A. Dombrowski. COHEN
COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined a deficiency of $ 150,729 in the Federal estate tax of the estate of Eleanor O. Pillsbury, deceased. After concessions, the issues remaining for decision are: (1) Whether the value of decedent's undivided 77-percent interest in real property is less than 77 percent of the value of a 100-percent interest in the property, (2) whether the value of decedent's undivided 77-percent interest in personal property is less than 77 percent of the value of a 100-percent interest in the property, (3) whether, because of the presence of underground fuel tanks on real property, the value of a 100-percent interest in that property should be discounted, and (4) whether the value of decedent's undivided 50-percent interest in real property is less than 50 percent of the value of a 100-percent interest in the property. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect at the date of decedent's death, and all Rule references are *443 to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Eleanor O. Pillsbury (decedent) died testate on June 12, 1987. San Diego Trust & Savings Bank (San Diego Trust) was the executor of decedent's estate. Cromwell Place Property and Furnishings
Decedent's husband, Clive N. Pillsbury (Pillsbury), died on July 14, 1982. In his will, Pillsbury gave to the Bank of America, as trustee, among other assets, the real property located at 3452 Cromwell Place, San Diego, California, including adjoining canyon acreage (Cromwell Place property), and its furnishings. The trustee was required to divide the entire trust estate into two trusts: Trust A, for the benefit of decedent, and Trust B, for the benefit of Pillsbury's issue. Trust A included an undivided 77.073096857-percent (77-percent) interest in the Cromwell Place property and in its furnishings. Trust B included an undivided 22.926903143-percent (23-percent) interest in the Cromwell Place property and in its furnishings. Pursuant to the terms of Pillsbury's will, upon decedent's death, interests *444 in the Cromwell Place property and in its furnishings held in Trust A were to be added to Trust B. At the time of decedent's death, Wells Fargo Bank was the successor trustee of both Trust A and Trust B. As such, it held the undivided 77-percent interests in the Cromwell Place property and in its furnishings and the undivided 23-percent interests in the Cromwell Place property and in its furnishings. The assets of Trust A were included in decedent's estate. On December 12, 1987, the fair market value of a 100-percent interest in the Cromwell Place property was $ 483,000. On December 12, 1987, the fair market value of a 100-percent interest in the furnishings at the Cromwell Place property was $ 38,260. Petitioner's Federal estate tax return was filed on March 14, 1988. Petitioner elected to value the property of the estate as of December 12, 1987 (the alternate valuation date). On its Federal estate tax return, petitioner reported the value of its undivided 77-percent interest in the Cromwell Place property at $ 275,970 and its undivided 77-percent interest in the furnishings at the Cromwell Place property at $ 25,065 as of the alternate valuation date. Petitioner determined *445 these values by calculating 77 percent of the value of a 100-percent interest and then taking a 15-percent fractional interest discount. National Avenue Property
Prior to her marriage to Pillsbury, decedent had been married to Neil Nettleship (Nettleship). Pursuant to a San Diego Superior Court decree dated December 3, 1965, distributing Nettleship's estate, decedent received an undivided 50-percent interest in real property located at 1776 National Avenue, San Diego, California (National Avenue property). San Diego Trust received an undivided 50-percent interest in the National Avenue property as trustee of a trust (the Nettleship Trust), all of the income of which was to be paid to decedent during her lifetime. Upon decedent's death, the trust's interest in the National Avenue property was to pass, in trust, to Natalie Nettleship. Pursuant to a lease dated March 15, 1980, San Diego Trust, as trustee of the Nettleship Trust, and decedent leased the National Avenue property to Howard L. Brockman (Brockman) for 5 years commencing May 1, 1980. The lease contained two 5-year extension options. On the National Avenue property, there were four underground fuel storage tanks *446 that had been there since at least 1954. Under the terms of the lease, Brockman was responsible for all costs associated with the property, including those costs relating to the underground fuel storage tanks and any contamination caused by them. On September 30, 1984, Brockman exercised the first 5-year extension option. At the end of 1984, Brockman discontinued use of the tanks. At that time, he was unaware of any contamination problems associated with the tanks. On March 9, 1984, decedent established the Eleanor O. Pillsbury 1984 Trust (1984 Trust). On January 26, 1987, decedent amended and restated the Declaration of Trust. The 1984 Trust included decedent's undivided 50-percent interest in the National Avenue property. The 1984 Trust provided that, upon decedent's death, the income and principal of the trust were to be paid to or applied for the benefit of Natalie Nettleship. On June 4, 1987, decedent resigned as trustee of the 1984 Trust. San Diego Trust assumed the duties of trustee. At the time of decedent's death, San Diego Trust, as trustee of the 1984 Trust and as trustee of the Nettleship Trust, held two undivided 50-percent interests in the National Avenue *447 property. On its Federal estate tax return, petitioner valued its undivided 50-percent interest in the National Avenue property at $ 40,000 as of the alternate valuation date. That value was based on an estimate by petitioner's counsel. After petitioner filed its Federal estate tax return, it employed Donald Blackstone (Blackstone), a member of the American Institute of Real Estate Appraisers and the Society of Real Estate Appraisers, to appraise a 100-percent interest in the National Avenue property. Blackstone appraised the property at $ 181,000 as of the alternate valuation date. Blackstone's appraisal report acknowledged the existence of the underground tanks, but it contained only a $ 10,000 downward adjustment to the value of the property attributable to the presence of the tanks. The appraisal report stated: We assume that the underground gas storage tanks have not caused any adverse soil conditions. We recommend that the underground gas and oil tanks be tested for possible leaks. We are not qualified soils engineers. * * * The value estimate is predicated on the assumption that there is no such material on or in the property that would cause a loss in value. *448 No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required to discover them. The client is urged to retain an expert in this field, if desired. [Emphasis added.] A full page Hazardous Waste Notice at the end of the report stated: During the inspection of the subject property, we have noted an apparent contamination from hazardous waste material and thus, must give constructive notice of this observation. We recommend our client and/or subsequent users of this appraisal report contact professional experts, such as civil, soils or chemical engineers, an industrial hygienist or geologist, or other persons with hazardous waste experience for professional advice. * * * * * * Therefore, we urge our clients, any real estate owners, buyers, tenants, and lenders involved with the real estate which is the subject of this report to consult their legal counsel to determine their respective rights and liabilities relative to potential hazardous waste materials on the subject property. It is essential to have legal and technical advice to determine necessary permits, approvals, clean up costs and expenses that might be associated with *449 the apparent storage, handling, clean up, disposal or removal of any apparent hazardous waste on the subject property. All we can do as professional appraisers is to give this constructive notice of apparent hazardous waste material on the subject or directly adjoining the property. We are not qualified to evaluate any conditions regarding hazardous waste materials. Brockman exercised the second 5-year extension option in his lease of the National Avenue property on January 21, 1990. He first became aware of a potential problem associated with the tanks in 1990. The tanks were removed in June 1990, at which time holes were discovered in three of the tanks. Soil contamination was discovered at that time. A Limited Environmental Subsurface Assessment report, prepared by Ninyo & Moore, a firm of geotechnical and environmental sciences consultants, and based on an investigation conducted in September 1991, revealed contamination of both soil and water at the National Avenue property. The extent of the contamination and the cost of further assessment and remediation were not determined. In the notice of deficiency, respondent determined that the fair market values as of the alternate *450 valuation date of petitioner's interests in the properties were $ 384,787 for the Cromwell Place property, $ 29,488 for the furnishings at the Cromwell Place property, and $ 106,108 for the National Avenue property. OPINION Section 2031(a) provides that the value of a decedent's gross estate shall include "the value at the time of his death of all property, real or personal". Section 2032(a) provides: The value of the gross estate may be determined, if the executor so elects, by valuing all the property included in the gross estate as follows: * * * (2) In the case of property not distributed, sold, exchanged, or otherwise disposed of, within 6 months after the decedent's death such property shall be valued as of the date 6 months after the decedent's death. Property includable in a decedent's gross estate is to be valued at its fair market value, which "is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Sec. 20.2031-1(b), Estate Tax Regs. The dispute between the parties concerns the fair market value on the alternate *451 valuation date, December 12, 1987, of property included in decedent's gross estate. The fair market value of property is a question of fact. , affg. . Petitioner bears the burden of proving that the values determined by respondent are incorrect. Rule 142(a). Cromwell Place Property
Petitioner contends that the value of decedent's undivided 77-percent interest in the Cromwell Place property is less than its proportionate share of the value of the whole property. On its Federal estate tax return, petitioner claimed a 15-percent fractional interest discount in valuing the Cromwell Place property. Petitioner now contends that a 20-percent fractional interest discount is appropriate. Respondent contends that no discount should be allowed. Respondent argues that, because 100 percent of the interests in the Cromwell Place property were held by Wells Fargo Bank, as trustee, a willing buyer would not require a fractional interest discount. This unity of ownership argument is inconsistent with the willing buyer-willing seller rule. Because the willing buyer and *452 willing seller are hypothetical, it is irrelevant that the seller is also the holder of the remainder of the interest. Cf. (holding that, in valuing stock, the identity of the real seller of the stock is irrelevant). This case is distinguishable from , which respondent cites. In that case, no discount from fair market value to reflect the marketability of fractional interests was allowed because, although the taxpayer held an undivided fractional interest in the trust property, the terms of the trust instrument required that the trust corpus be sold as an entire fee simple interest. Regardless of who the hypothetical willing seller was, under the terms of the trust instrument, the property would be sold as a unit, and there would be no fractional interest discount. In this case, there was no such requirement in the trust instrument. Although the trust might have sold the entire property as a single unit, as a hypothetical willing seller, it was under no legal obligation to do so. Petitioner offered the expert report and *453 testimony of David J. Yerke (Yerke), an appraiser, to support its contention. Yerke concluded that a hypothetical buyer of an undivided 77-percent interest in the Cromwell Place property would discount the proportionate share of the 100-percent interest to account for the disadvantages associated with a fractional interest, such as the lack of general control, lack of marketability, illiquidity, and potential partitioning expenses. Although the Cromwell Place property represents a majority interest, the owner of the property would nevertheless need an agreement or consent from the minority owner in order to exercise all of the rights associated with ownership of the property. Yerke concluded that discounts for such noncontrolling interests in real estate were accepted as part of the valuation of such interests. Yerke concluded that a discount of 20 percent would be appropriate. Relying on , and , respondent contends that, although a fractional interest discount may be appropriate under certain circumstances, petitioner has not met its *454 burden of proving that such a discount is appropriate with respect to the Cromwell Place property and that, therefore, no discount should be allowed. Respondent criticizes Yerke's methodology of relying on court decisions and argues that the analysis in Yerke's report is not specific enough to warrant the report's conclusions. Respondent argues that Yerke did not rely on any comparable sales and did not offer a specific method for determining the proper amount by which the fractional interests should be discounted. Relying on ; ; ; ; , respondent contends that the Court should consider Yerke's appraisal unpersuasive and give it no weight. We disagree. Yerke admitted to not relying on comparable sales of fractional interests in reaching his conclusions. Although he had searched for comparable sales, he was unable to find any. Furthermore, *455 with regard to respondent's contention of a lack of specificity in Yerke's analysis, we rely on the statement in , affd. , that "Valuation of real estate, like many questions of fact, can never be completely rationalized." Because we agree with respondent's argument criticizing Yerke's reliance upon court decisions, we disregard Yerke's report to the extent that he relies on those decisions. Yerke's report and testimony do provide support for the conclusion that the fair market value of a fractional interest in real property cannot be derived merely by applying the percentage of the interest in the whole property to the value of the whole property. See . Respondent has presented no evidence to the contrary. Because we are not bound by the opinion of any expert witness, we may apply our own best judgment in determining the appropriate amount of the discount. . The 15-percent discount claimed on petitioner's estate tax return is an admission *456 as to the maximum discount, which petitioner cannot overcome without cogent proof that it is wrong. ; . Based on the record before us, we conclude that a discount of 15 percent is appropriate. Furnishings
On its Federal estate tax return, petitioner discounted the fair market value of its undivided 77-percent interest in the furnishings at the Cromwell Place property by 15 percent to account for a fractional interest. Petitioner now contends that it is entitled to a 20-percent fractional interest discount. Respondent contends that petitioner has not met its burden of proof with respect to the claimed discount and that, therefore, no discount should be permitted. Petitioner has presented no evidence to support its claim of a fractional interest discount. Petitioner argues that the same considerations that apply to allowing a discount for real property should apply to personal property and that not to allow a discount would be contrary to common sense. A bare assertion that a discount is appropriate, however, with no evidence *457 to support it cannot be upheld. Cf. (holding that, where there is nothing in the record to indicate that the value of a fractional part of real property is less than the proportionate part of the value of the whole, no fractional interest discount will be permitted). We therefore sustain respondent's determination that the value of an undivided 77-percent interest in the furnishings at the Cromwell Place property is equal to its proportionate share of the value of the whole. National Avenue Property
The parties agree to the appraised value of $ 181,000 as the value of a 100-percent interest in the National Avenue property. Petitioner, however, argues that the appraised value represents the fair market value of the property without regard to the possibility that the underground tanks had leaked and caused contamination. The question to be decided is whether a hypothetical buyer on December 12, 1987, with reasonable knowledge of the relevant facts, would have discounted the value of the National Avenue property from the figure determined by Blackstone. Respondent argues that no discount should be *458 permitted because, as of December 12, 1987, neither petitioner's counsel nor Brockman anticipated a hazardous waste problem and there was no evidence that the fuel tanks had caused contamination of the property. We acknowledge that: actual ignorance of particular facts by either the executors or the Internal Revenue Service as of the date of appraisal is not sufficient to remove reasonably discoverable facts from consideration. The very definition of fair market value presumes that a careful investigation of all available data will be made by the participants. . Thus, common sense dictates taking into consideration only those facts which a reasonable investigation, in light of all the circumstances, would have disclosed. [ USTC par. 13,228 at 84,369 (Ct. Cl. Trial Div. 1978).] As of the alternate valuation date, a knowledgeable buyer would have been aware of the existence of the fuel tanks on the property. A buyer reading an appraisal such as that prepared by Blackstone would have been alerted to potential *459 hazardous waste problems and the cleanup costs associated with them. Neither the appraiser nor petitioner, however, believed that the further investigation was necessary before stating a value for the property. They have given us no reason to believe that a hypothetical buyer would have done any more. Respondent also argues that the finding of contamination at the National Avenue property described in the Limited Environmental Assessment report is irrelevant because it was discovered 4 years after the valuation date. Although it is true that "property is valued as of the valuation date on the basis of market conditions and facts available on that date without regard to hindsight", subsequent "events can be considered by the Court for the 'limited purpose' of establishing what the willing buyer and seller's expectations were on the valuation date and whether these expectations were 'reasonable and intelligent.'" (quoting , citing . The most persuasive *460 subsequent event here, however, is the failure of petitioner to investigate the effect of contamination until the month before trial of this case. Respondent points out that Brockman, according to the terms of his lease, bears responsibility for any cleanup of the site and that such costs might have been borne by insurance carriers. That may explain why petitioner was only concerned about the contamination insofar as it would arguably reduce value for estate tax purposes. In any event, there is no evidence in the record from which a discount for the contamination of the National Avenue property can be determined. Petitioner states: Taxpayer has not proposed a specific amount by way of a toxic waste discount because it is in the interest of the Eleanor Pillsbury trust to have no discount (and thus a high tax basis for income tax purposes), but it is in the interest of the Clive Pillsbury trust, which must indemnify the Eleanor Pillsbury trust for all tax, to have a high discount. As the court observed at the pretrial conference, the conflict can be resolved by arguing for the proper value. Taxpayer leaves the determination of that proper value to the court. The Court is not *461 required to or permitted to guess what is the proper discount. Petitioner has not satisfied its burden of proof. Petitioner also argues that the value of its undivided 50-percent interest in the National Avenue property should be subject to a 20-percent fractional interest discount. The parties' contentions with respect to claiming a fractional interest discount are the same as those with respect to the Cromwell Place property. Although there was no admission on petitioner's estate tax return with respect to the maximum amount of the discount, petitioner has not persuaded us that a discount greater than 15 percent should be applied. For the reasons set forth with respect to the Cromwell Place property, we will allow a 15-percent fractional interest discount for the National Avenue property. We have considered the other contentions of the parties and conclude that they are irrelevant to the disposition of this case. To reflect the foregoing and concessions by the parties, Decision will be entered under Rule 155.